1
2
3
4
5
6
7                    IN THE UNITED STATES DISTRICT COURT

8                   FOR THE EASTERN DISTRICT OF CALIFORNIA

9    ROBYN TREMAYNE,

10              Plaintiff,                    No. CIV 08-2795 EFB

11         vs.

12   MICHAEL J. ASTRUE,
     Commissioner of Social Security,
13
                Defendant.              /      ORDER
14   _____/

15         Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security

16   ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title

17   II of the Social Security Act.  For the reasons discussed below, the court remands the case for

18   further proceedings in accordance with this order.

19   I.  BACKGROUND

20         Plaintiff, born November 8, 1978, formally applied for Disability Insurance Benefits on

21   October 27, 2005, claiming she had been disabled since September 5, 2005.  Administrative

22   Record ("AR") 16.  On February 17, 2006 a Regional Commissioner denied plaintiff's

23   application on the basis that plaintiff lacked the requisite disability.  *Id.* at 79-83.  Plaintiff

24   requested reconsideration of the denial, but the Regional Commissioner denied plaintiff's request

25   on May 31, 2006.  *Id.* at 74-78.  Plaintiff then formally requested a hearing on the denial, and a

26   hearing was held before administrative law judge ("ALJ") Sandra K. Rogers on February 12,

                                              1

2008.  *Id.* at 56-71.  Plaintiff was represented by counsel at the hearing, and testified at the hearing, along with Vocational Expert ("VE") David M. Dettmer.  *Id.*

The ALJ issued a decision on April 15, 2008, finding that plaintiff is not disabled.[1]  *Id.* at 13-24.  The ALJ made the following specific findings:

> 1.  The claimant meets the insured status requirements of the Social Security Act through March 31, 2008.
>
> 2.  The claimant has not engaged in substantial gainful activity since September 5, 2005, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq.*).
>
> ***
>
> 3.  The claimant has the following severe impairments: osteoarthritis of the knee, a bipolar disorder, borderline personality traits, and carpal tunnel syndrome (20 CFR 404.1520(c)).
>
> 4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed

_____

[1]  Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. §§ 1382 *et seq.*  Disability is defined, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. § 1382c(a)(3)(A).  A five-step sequential evaluation governs eligibility for benefits under the SSI program.  *See* 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 and 416.971-76; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  The following summarizes the sequential evaluation:

> Step one:  Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.
> Step two:  Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.
> Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.
> Step four:  Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.
> Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

*Lester v. Chater,* 81 F.3d 821, 828, n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  *Bowen*, 482 U.S. at 146 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  *Id.*

impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

\*\*\*

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a limited range of light work as defined in 20 CFR 404.1567(b).  The claimant remains able to do simple repetitive tasks with limited public contact.  She can occasionally climb and balance but cannot kneel or crawl.  She can do no forceful or repetitive gripping, grasping, twisting or torquing with her hands.

\*\*\*

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565).

\*\*\*

7.  The claimant was born on November 8, 1978 and was 26 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CRF 404.1564).

\*\*\*

9.  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CRF 404.1568).

\*\*\*

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

\*\*\*

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 5, 2005 through the date of this decision (20 CFR 404.1520(g)).

*Id.* at 16-24.

////

////

1    Plaintiff requested that the Appeals Council review the ALJ's decision.  *Id.* at 9.

2  However, on September 15, 2008, the Appeals Council denied review, leaving the ALJ's

3  decision as the "final decision of the Commissioner of Social Security."  *Id.* at 5-7.

4  II.  <u>MEDICAL EVIDENCE REGARDING PLAINTIFF'S MENTAL LIMITATIONS</u>

5    Beginning August 23, 2005, the record contains a series of notes and recorded

6  assessments of plaintiff's mental state from Trinity County Behavioral Health Services.  On

7  August 23, Trinity County Behavioral Health Services completed a Brief Assessment/Opening

8  Episode form.  In it, Dana Hiney, L.C.S.W, states that plaintiff:

9        comes to the clinic feeling she is in a crisis after years of trying
         to live with an abusive addict who is also a disabled man.  She
10       has been having worsening depression with insomnia, suicidal
         thinking, weight loss and a tendency to distrust relationships and
11       isolate socially.  She has times of feeling a sense of panic and under
         extreme stress she has voices that tell her to harm herself . . . She is
12       intelligent, she is strong and motivated to get removed from the
         tendencies of her past.

13

14  AR 161.  At that time, Ms. Hiney gave plaintiff the following diagnosis:

15        Axis I:        Major Depression, recurrent severe
                         PTSD
16                       Polysubstance Abuse in partial remission
          Axis II:       Borderline Personality Disorder
17        Axis III:      Weight loss, seasonal allergies, bronchitis
          Axis IV:       Divorcing husband, economic stress, survivor of [domestic
18                       violence] and childhood abuse
          Axis V:        50[2]
19

20  *Id.* at 162.

21  ////

22
    _____

23       [2]  The Global Assessment of Functioning ("GAF") Scale "[c]onsider[s] psychological,
    social, and occupational functioning on a hypothetical continuum of mental health-illness."  The
24  American Psychiatric Association's Multiaxial Assessment, set forth in the Diagnostic and
    Statistical Manual of Psychiatric Disorders, ("DSM-IV") (4th Ed. 2005), at 34.  A GAF of 41 to
25  50 denotes "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent
    shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no
26  friends, unable to keep a job)."

4

A second assessment by Ms. Hiney, dated August 24, 2005, reflected that plaintiff reported making suicide attempts in the past.  Her mental status exam indicated that she was currently anxious with a depressed mood and her judgment was mildly impaired.  It also stated that plaintiff was given Zyprexa briefly and felt a "good effect" from it.  *Id.*

Another progress note, dated August 31, 2005, states that plaintiff "is still anxious and fearful of what is coming but has made more steps to meet her goal and feels better this week after attending several 12 step meetings and having had a chance to let some of it go in session last week." *Id.* at 155.  A September 1, 2005, progress report prepared by Ms. Hiney stated: "She is clearly anxious and in great distress.  She is overwhelmed, her process is scattered by anxiety and the pressure of her need and fear.  She is in a huge transition and feels completely alone in it. The sheer volume of tragedy in her life is overwhelming." *Id.* at 156.

A September 7, 2005 progress note states that plaintiff "talked a bit about resigning her position at her job to avoid being fired.  She was accused of making a rude comment to another employee but she felt she had not." *Id.* at 153.  A progress note dated October 12, 2005 states that plaintiff "still hears and sees things . . . [a] voice will tell her - 'You're not worth it, you better do this or that,' and the voices tell her to hurt herself."  *Id.* at 147.

On November 8, 2005, Ms. Hiney noted that plaintiff:

> has not attended her appointments frequently enough for me
> to create an appropriate service plan for her.  She returned to
> therapy today so now I hope she will continue to come at which
> point I will better be able to assess her goals for treatment.
> [Plaintiff] continues to have depression and anxiety.  She is avoiding
> people she says and hates everyone . . . She has suicidal feelings
> but won't harm herself because it would harm her kids.

*Id.* at 143.  Progress notes from November 14, 2005 reflected that during a tele-psych appointment with Dr. Weiser, plaintiff reported that she felt anxious, was having night sweats, did not want to go out in public anymore, and had been having dreams that were "just strange with lots of animals." *Id.* at 142.  She stated that she felt extremely anxious; was having a hard time being around people; was still hearing "nasty voices"; was seeing "spec[k]s – like floating

colors"; would sometimes experience a "presence"; and had thoughts of death and dying.  *Id.*

On November 23, 2005, Ms. Hiney again completed a report noting that plaintiff "presents with somewhat a confused picture of someone who is scared to be out in the world, who is mistrusting everyone but who is wanting to trust, to love and be loved."  *Id.* at 139.  The report notes that plaintiff was "slightly paranoid about being harmed by others" and was "anxious but a bit less depressed without suicidal ideation."  *Id.*

December 19, 2005 SSA Physical Residual Functional Capacity Assessment - Dr. Miller

On December 19, 2005, Dr. W.S. Miller, M.D., completed an assessment of plaintiff's Physical Residual Functional Capacity ("RFC").  The conclusions reached in the assessment were based on the conclusions of all evidence in plaintiff's file.  *Id.* at 227.  Dr. Miller assessed plaintiff's exertional limitations, postural limitations, manipulative limitations, visual limitations, communicative limitations, and environmental limitations.  *Id.* at 227-31.  Dr. Miller concluded that plaintiff presented with certain exertional limitations.  Specifically, plaintiff could only occasionally lift and carry a maximum of twenty pounds, she could frequently lift and carry a maximum of only ten pounds, she could stand/walk for a total of six hours in an eight hour workday, but noted that she could only engage in noncontinuous walk/stand action for two hours at a time, and that she could sit (with normal breaks) for a total of six hours in an eight hour workday.  *Id.* at 228.  Finally, Dr. Miller noted that plaintiff had an unlimited ability to push and/or pull (including operation of hand and/or foot controls) subject to her limitations regarding lifting and carrying.  *Id.*

Next, Dr. Miller assessed plaintiff's postural limitations.  Dr. Miller determined that plaintiff could never kneel or crawl, she could occasionally climb ramps, stairs, ladders, ropes, or scaffold, and she could frequently balance, stoop, or crouch.  *Id.* at 229.  Finally, Dr. Miller concluded that plaintiff had no established manipulative limitations, visual limitations, communicative limitations, or environmental limitations. *Id.* at 230-231.  In the additional comments section, Dr. Miller noted that plaintiff is limited to moderately light activity by bad

1  knees.  *Id.* at 234. Dr. Miller's assessment was reviewed and affirmed by Dr. P. Suster, M.D.,

2  another DDS physician, on May 26, 2006.

3  <u>January 6, 2006 SSA Psychiatric Examination - Dr. Richwerger</u>

4  Dr. David Richwerger, a Psychologist for the Department of Social Services Disability

5  Evaluation Division, began his Psychiatric Evaluation of plaintiff by completing a review of her

6  Medical Records.  *Id.* at 235.  Dr. Richwerger indicated that he reviewed the August 23, 2005

7  "Brief Assessment" by Ms. Hiney at Trinity County Behavioral Health Services, which *inter*

8  *alia*, found that plaintiff was in a crisis and had a GAF score of 50; the August 24, 2005

9  assessment by Ms. Hiney, which *inter alia*, found that plaintiff had made suicide attempts in the

10  past, is anxious with depressed mood, and had mildly impaired judgment; the November 8, 2005

11  report from Ms. Hiney that plaintiff had not attended her appointments frequently enough to

12  create an appropriate service plan; a progress note from Ms. Hiney reflecting that plaintiff was

13  feeling alone and isolated; and reports from Dr. Dolci that medications had been refilled and

14  indicating that plaintiff had carpal tunnel, arthritis, and endogenous depression.  *Id.* at 235-36.

15  Dr. Richwerger's report reflected that plaintiff stated:  "I can't go into public without

16  getting outraged.  I hear voices telling me to do bad things."  AR 236.  The report reflected that

17  plaintiff began having problems in 2003, and that her main problem was that she suffered from a

18  bipolar condition and as a result was not able to work.  *Id.*  The report further reflected that

19  plaintiff was hospitalized for three days at Shasta County Mental Health in 2002 for a suicide

20  attempt by an overdose of pills.  She also reported outpatient psychiatric treatment at Trinity

21  County Behavioral Health since 1996.  She stated that currently she had problems caused by

22  hearing voices.  The psychological history portion of Dr. Richwerger's report stated:

23  > The claimant states she has difficulty concentrating and difficulty
> with her memory.  The claimant states she has problems hearing
24  > voices, which began in 1996.  The claimant states they are less
> often now.  The claimant states she has troubling thoughts and
25  > often feels anxious and depressed.  The claimant states, "I am
> constantly both anxious and depressed."  The claimant states she
26  > has suicidal thoughts daily.  She states that she had a suicide

> attempt in 2002 or 2003, and she was hospitalized.  The claimant
> states she has always had suicidal ideation daily for a long time.
> The claimant denies homicidal ideation, but she stated she has had
> them in the past.  The claimant states she [is treated by] Dr. Wizer
> and is prescribed Zyprexa, Trazodone, Celebrex, Singular and
> Naproxen.  The claimant states the medication helps somewhat.

*Id.*

Plaintiff reported that she was a counter attendant at Starbucks, and stopped working there because of too much stress.  She reported that she sometimes had difficulty dealing with other people besides coworkers.  Plaintiff reported that she drank alcohol rarely and denied both past and present use of street drugs.  *Id.* at 237.  She stated that she did not sleep well, and had intermittent awakenings.  She reported that she does "occasional household chores, driving, dressing, bathing, and cooking" but that her husband did all the shopping.  Her outside activities consisted of hiking and riding a bike.  *Id.* at 237, 238.  Plaintiff also stated that she takes care of her children on a daily basis.  *Id.* at 238.

Dr. Richwerger reported that plaintiff was 5'2" and weighed 212 pounds.  She stated to him that she had "suicidal ideation all the time - everyday" but he reported that she did not present with a flattened affect.  *Id.* at  238.  Dr. Richwerger reported that throughout the evaluation plaintiff was "often joking and laughing."  *Id.*  He noted that her "interpersonal behaviors appeared somewhat inconsistent with the history given."  *Id.*

Dr. Richwerger's DSM-IV diagnostic impression was:

| | |
|---|---|
| Axis I: | Bipolar II, mixed. |
| Axis II: | Borderline personality traits. |
| Axis III: | As discussed. |
| Axis IV: | Employment-related concerns. |
| Axis V: | GAF is 60.[3] |
| Prognosis: | Chronic. |

---

[3]  A GAF of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school function (e.g., few friends, conflicts with peers or co-workers).

1   *Id.* at 239, 240.  Dr. Richwerger's Functional Assessment was:

2                The claimant appears to have a slight impairment in her
                ability to perform detailed and complex tasks.  The claimant
3                appears to have no impairment in her ability to perform simple
                and repetitive tasks.  The claimant appears to have a moderate
4                impairment in her ability to perform work activities on a consistent
                basis.  The claimant appears to have no impairment in her
5                ability to perform work activities without special supervision.
                The claimant appears to have a moderate impairment in her ability
6                to complete a normal workday or workweek without interruption
                from a psychiatric condition.  The claimant appears to have a slight
7                impairment in her ability to understand and accept instructions from
                supervisors.  The claimant appears to have a moderate impairment in
8                her ability to interact with coworkers and the public.  The claimant
                appears to have a slight impairment in her ability to maintain regular
9                attendance in the workplace.  The claimant appears to have a moderate
                impairment in her ability to deal with the usual stresses encountered in
10               competitive work.

11  *Id.* at 240.

12          February 15, 2006 SSA Mental Residual Functional Capacity Assessment - Dr. Nguyen

13          On February 15, 2006, Dr. H. Nguyen, M.D., a Social Security Administration Disability

14  Determination Service ("DDS") psychiatrist, completed a Mental RFC form after the Psychiatric

15  Examination, discussed above, was conducted by Dr. Richwerger.  Dr. Nguyen's summary

16  conclusions were divided into four groupings:  Understanding and Memory, Sustained

17  Concentration and Persistence, Social Interaction, and Adaptation.  *Id.* at 242-43.

18          In the Understanding and Memory portion of the assessment, Dr. Nguyen concluded that

19  plaintiff was not significantly limited in her ability to remember locations and work-like

20  procedures or in her ability to understand and remember very short and simple instructions.  *Id.*

21  Dr. Nguyen did conclude that plaintiff was moderately limited in her ability to understand and

22  remember detailed instructions.  *Id.*

23          In the Sustained Concentration and Persistence portion of the assessment, Dr. Nguyen

24  again found that plaintiff was moderately limited in some areas, but not others.  The areas that

25  Dr. Nguyen found plaintiff to be moderately limited in were:  ability to carry out detailed

26  instructions; ability to maintain attention and concentration for extended periods; and ability to

complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  *Id.* at 242-43.  The areas that plaintiff was not significantly limited were:  ability to carry out very short and simple instructions; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; ability to sustain an ordinary routine without special supervision; ability to work in coordination with or proximity to others without being distracted by them; and ability to make simple work related decisions.  *Id.*

Next, Dr. Nguyen assessed plaintiff's Social Functioning limitations.  Dr. Nguyen concluded that plaintiff would have moderate limitations in the following areas:  ability to interact appropriately with the general public; ability to accept instructions and respond appropriately to criticism from supervisors; and ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  *Id.* at 243.  Dr. Nguyen concluded plaintiff would not be significantly limited in her  ability to ask simple questions or request assistance, or in her ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  *Id.*

The last area of assessment evaluated by Dr. Nguyen was Adaptation.  Dr. Nguyen concluded that plaintiff would have moderate limitations in her ability to respond appropriately to changes in the work setting.  *Id.*  Dr. Nguyen, however found that plaintiff would not be significantly limited in her ability to be aware of normal hazards and take appropriate precautions, or in her ability tot set realistic goals or make plans independently of others.  *Id.*  Additionally, there was no evidence of a limitation in plaintiff's ability to travel in unfamiliar places or use public transportation.  *Id.*

Finally, Dr. Nguyen provided his Functional Capacity Assessment.  In the last portion of the assessment, Dr. Nguyen stated that plaintiff would be "[a]ble to do [simple repetitive tasks] with limited public contact."  *Id.* at 244.  In a  Psychiatric Review Technique form completed the same day as the RFC assessment, Dr. Nguyen noted that plaintiff would have moderate

limitations in her ability to maintain social functioning and in her ability to maintain

concentration, persistence, or pace. *Id.* at 247. The final notes on this form also indicate that Dr.

Nguyen assessed plaintiff as being bipolar, with a GAF of 60, and found that she exhibited

borderline traits. *Id.* at 249. Dr. Nguyen's findings were then reviewed and affirmed on May 25,

2006 by Dr. David Gross, M.D., another DDS practitioner. *Id.* at 245.

A February 22, 2006 Assessment Update completed by Ms. Hiney indicates her

perception of plaintiff's mental state around the time that the SSA mental health professionals

conducted their examinations. On February 22, Dana Hiney indicated that plaintiff "is better but

continues to deal with depression and having to force herself into activities. She feels

overwhelmed and sometimes unable to make decisions. She continues to be mistrustful of others

and want to get away from Weaverville." *Id.* at 204. In another portion of the assessment, Ms.

Hiney notes that plaintiff "remains somewhat paralyzed by her depression. She is capable of

working but has quit her job and has not returned to appropriate employment. She does do home

care for an elderly woman but this is far below her capacities." *Id.* at 206.

III. <u>SUMMARY OF TESTIMONY AT ADMINISTRATIVE HEARING</u>

Plaintiff and VE David Dettmer testified at plaintiff's February 12, 2008 hearing.

Plaintiff testified that she was born November 8, 1978, and that she had graduated high school

and taken a few college courses. AR 58. She testified that her last regular job, working as a

Starbucks coffee attendant, ended in 2005. *Id.* at 59. She also testified that she had a short

caretaking job that lasted about six weeks, but her attorney did not think that this amounted to

substantial gainful activity. *Id.* at 60.

Plaintiff then testified about the problems she was having with her knee. *Id.* She

testified that her knee causes her a lot of pain and that she is unable to stand, run, or do anything

that's extreme for long periods of time, and that her activity is substantially limited. *Id.* She

confirmed that she wears a knee brace, but was not wearing one on the day of the hearing. *Id.*

She reported that she was taking ibuprofen, a stool softener, Vicodin, and also that she was using

an inhaler.  *Id.*  She stated she was not using any psychotropic medications at the time because she was nursing and the medications had a lot of side effects.  *Id.*  She also testified that she had been diagnosed with carpal tunnel in her right hand and wrist, and that she wore a wrist brace on both hands every night.  *Id.* at 62.

Plaintiff testified that her mental and emotional state had been unstable.  *Id.* at 61.  She explained that she was suffering from tremendous anxiety, depression, and suicidal thoughts.  *Id.*  She also stated that she was having real problems with being in society and "around lots of other people."  *Id.*  Plaintiff testified that she had not been to her treatment sessions at Trinity County Behavioral Health Services since November of 2007 because she lived in Dunsmuir, and due to the snow, was unable to get to Mt. Shasta for treatment.  *Id.* at 61-62.

Plaintiff stated that she lived with her boyfriend and their infant son.  *Id.* at 62.  She testified that her boyfriend had been taking care of almost all household tasks for the entire year that they had been living together.  *Id.*  She testified that she was able to do some tasks such as taking the clothes out of the washer, putting them in the dryer, washing glasses, and making a bed.  *Id.* at 63.  She explained that sitting occasionally gave her problems and she would usually sit fifteen minutes at a time.  *Id.*  She testified that standing and walking usually caused pain in her knee after 10 minutes.  *Id.*  She testified that she usually needs to lie down for about an hour at least once a day because of pain in her knee.  *Id.* at 64.  She explained that the pain is often caused by standing or sitting for too long.  *Id.*  She stated that she had a prescription for physical therapy, but that she had not started the therapy because she had moved to Dunsmuir and was unable to find a place that took her Medi-Cal insurance.  *Id.*

Plaintiff was then asked about her history involving substance abuse.  She testified that she had no substance abuse problem at the time but that up until 2002 she abused methamphetamine.  *Id.*  She testified that she was able to stop using methamphetamine by seeking recovery and by attending Narcotics Anonymous (NA) meetings and church.  *Id.* at 65.
////

1  With regards to alcohol, she testified she had been sober for almost a year and that she attended

2  Alcoholics Anonymous meetings regularly.  *Id.*

3      The ALJ and plaintiff's attorney then began posing hypothetical questions to the VE.  In

4  the first hypothetical the ALJ asked the VE to:

5          First assume a person the same age, education, and work
           experience as the claimant and if we assume as was set forth in
6          Exhibit 5F that they could do light work but with only occasional
           climbing, balancing, never kneeling, and never crawling and could
7          perform only simple repetitive tasks with limited public contact.
           Would such a person be able to perform the claimant's past
8          relevant work?

9  *Id.* at 67.  The VE testified "Not the counter attendant.  I don't see what, I don't see anything

10 here to preclude the housekeeping work, Judge."  *Id.*

11     The ALJ then allowed plaintiff's counsel to pose questions to the VE.  Plaintiff's counsel

12 then asked the following: "Mr. Dettmer, on the last hypothetical, just add this, add this and this is

13 from page two of Exhibit 5F, Your Honor, non-continuous walk/stand two hours at [a] time.

14 Does that make any difference on your answer regarding housekeeping?"  *Id.* at 67-68.  The VE

15 responded: "Well, a housekeeper is on their feet all day long so I would say that if they could

16 only do, walk or stand two hours at a time, it would be precluded from the housekeeping work."

17 *Id.* at 68.  Plaintiff's counsel then posed the following hypothetical:

18         I want you to assume the Judge's hypothetical that she asked
           regarding physical impairments, but I'm going to give you more
19         detail on the mental impairments from, Judge, from Exhibit 7F,
           pages one and two.  Assume moderate limitations in the following
20         areas.  Ability to understand and remember detailed instruction,
           ability to maintain attention and concentration for extended
21         periods, ability to complete a normal workday and workweek
           without interruptions from psychologically based symptoms and to
22         perform at a consistent pace without an unreasonable number and
           length of rest periods.  Ability to interact appropriate with the
23         general public.  Ability to accept instructions and respond
           appropriately to criticism from supervisors, ability to get along
24         with co-workers or peers without distracting them or exhibiting
           behavioral extremes.  Ability to respond appropriately to changes
25         in the work setting.  If we take the combined impact of those
           mental limitations at the moderate level, would those limitations
26         preclude the performance of the job you have told us about?

13

1    *Id.* at 68-69.  The VE testified that "Given the totality and the number of moderate ones, I would

2    say yes, they would preclude the entry level types of employment."  *Id.* at 69.

3          The ALJ then took over posing hypothetical questions and asked the VE the following:

4                If we were to assume a person the same age, education, and work
             experience as the claimant and if we were to now assume they were
5                limited to sedentary as opposed to light work, obviously they couldn't
             do their past work, would there be other jobs existing in the national
6                or regional economy such a person could perform?

7    *Id.*  The VE testified that there would be several thousand sedentary jobs in the economy at the

8    unskilled level.  *Id.*

9          Plaintiff's counsel then asked the VE the following:

10               [Y]ou've just testified to three different jobs.  Now I'm assuming
             from your previous answer that, that the mental impairments in
11               totality that I previously read to you would preclude, preclude the
             performance of those jobs, correct?

12

13   *Id.* at 70.  The VE answered "I would say that would be true."  *Id.*

14   IV.  <u>ISSUES PRESENTED</u>

15         Plaintiff contends that the Commissioner committed two principal errors in sustaining the

16   ALJ's determination that she is not disabled.  First, plaintiff contends that the ALJ failed to

17   properly assess her RFC.  Plaintiff argues the ALJ failed to do this in three ways:  first, by

18   rejecting the work related functional limitations addressed by Dr. Richwerger, the Social

19   Security Examining Psychologist, and Drs. Nguyen and Miller, DDS Medical reviewers, without

20   legitimate reasons for doing so; second, by failing to assess the impact of plaintiff's obesity

21   pursuant to Social Security Regulation ("SSR") 02-01p; and third, by failing to properly

22   characterize and credit plaintiff's testimony and third-party statement as to the nature and extent

23   of her functional limitations.  Next, plaintiff contends that the ALJ failed to pose legally

24   adequate hypothetical questions to the VE and failed to credit the testimony of the VE in

25   response to the hypothetical which accurately reflected plaintiff's functional limitations.

26   ////

14

V.  LEGAL STANDARDS

The Commissioner's decision that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence in the record and the proper legal standards were applied. *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000); *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999).

The findings of the Commissioner as to any fact may only be set aside by this court if it is found that the findings are "based on legal error or not supported by substantial evidence." *Reddick v. Chater*, 157 F.3d 715 (9th Cir. 1996)(*citing Smolen v. Chater*, 80 F.3d 1273, 1279). Substantial evidence is more than a mere scintilla, but less than a preponderance. *Saelee v. Chater*, 94 F.3d 520, 521 (9th Cir. 1996). "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

VI.  ANALYSIS

    A.      RFC Determination

            1.      Consideration of Plaintiff's Mental and Physical Impairments

                    a.      Parties' Arguments

With regard to plaintiff's mental limitations, plaintiff contends that the ALJ gave too much weight to Dr. Ngyuen's final RFC assessment, which concluded that plaintiff retained the mental capacity to perform "simple repetitive tasks with limited public contact," and failed to give sufficient weight to the other mental limitations set forth in his report and Dr. Richwerger's

report.  Pl.'s Mot. for Summ. J. ("MSJ") at 22.

Dr. Richwerger, plaintiff argues, concluded in his Psychiatric Evaluation of plaintiff that she appeared to suffer from Bipolar Disorder II, mixed, and borderline personality traits.  Pl.'s MSJ at 22; AR 239.  Plaintiff also argues that Dr. Richwerger determined her GAF to be at 50, but upon review of the record, it appears that Dr. Richwerger assessed her GAF to be at 60 after his evaluation.  MSJ at 22; AR 239.  Plaintiff argues that the ALJ improperly gave "great weight" to Dr. Richwerger's observations that plaintiff had "only slight or no limitations in certain areas of functioning," but failed to give sufficient weight to Dr. Richwerger's opinion regarding plaintiff's moderate mental limitations.  MSJ at 22.  The moderate limitations were in areas such as plaintiff's ability to perform work activities on a consistent basis, her ability to complete a normal workday or workweek without interruption from a psychiatric condition, her ability to interact with coworkers and the public, and her ability to deal with the usual stresses encountered in competitive work.  AR 240.

Similarly, plaintiff contends that the ALJ gave Dr. Nguyen's opinion that plaintiff "would be able to perform simple repetitive tasks with limited public contact despite her moderate limitations" great weight, but improperly rejected his actual findings regarding those limitations.  MSJ at 23.  These findings included moderate limitations in her ability to understand and remember detailed instructions, her ability to carry out such instructions, her ability to maintain attention and concentration for long periods of time, her ability to complete a normal work week without interruption from psychological symptoms, her ability to perform at a consistent pace without an unreasonable number of rest periods, her ability to interact with the public, her ability to accept instructions and respond appropriately to criticism from her supervisors, her ability to get along with coworkers without distracting them or exhibiting behavioral extremes, and her ability to respond appropriately to changes in the work setting.  AR 243.

////

Finally, plaintiff argues that the ALJ failed to recognize the similarities between the functional limitations assessed by Social Security physicians and those assessed by her treating mental health providers at Trinity and Woodland Healthcare Facility.  MSJ at 23-24.  These reports indicated that plaintiff was suffering from "paralyzing depression," mistrust of others, and personality conflicts, all of which severely limited her ability to hold a job.  MSJ at 24-25; AR 204-06, 212-14.

Defendant counters that the ALJ properly based her conclusion about plaintiff's mental RFC on the opinion expressed by Dr. Nguyen, which was agreed upon by Dr. Gross, and which was supported by Dr. Richwerger's evaluation.  Def.'s MSJ at 8.  Defendant argues that Dr. Richwerger concluded that plaintiff had no "impairment in her ability to perform simple and repetitive tasks."  Def.'s MSJ at 8; AR 240.  According to defendant, these findings were consistent with Dr. Nguyen's and the ALJ's final conclusions.  Def.'s MSJ at 8.

Additionally, defendant contends that the ALJ did not err by failing to include Dr. Nguyen's findings of moderate limitations in her RFC assessment.  *Id.*  Defendant asserts that plaintiff misunderstands the meaning of residual functional capacity; that it means *not* what an individual's limitations are, but what the individual remains capable of doing despite those limitations.  *Id.*; *see* 20 C.F.R. § 404.1545(a) ("Your residual functional capacity is the most you can still do despite your limitations.").  Defendant argues that Dr. Nguyen's "findings of certain limitations informed his RFC determination, but were not part of it; his RFC finding was that plaintiff could perform simple repetitive tasks with limited public contact."  Def.'s MSJ at 8.  Similarly, defendant contends that Dr. Richwerger did not issue an RFC assessment, but only provided a psychiatric evaluation, which in the end supported Dr. Nguyen's conclusion.  *Id.* at 8-9.

With regard to plaintiff's physical limitations, plaintiff contends that the ALJ gave great weight to the DDS reviewing physician, Dr. Miller's, opinion regarding what plaintiff could do physically, but failed to include that plaintiff was limited to "noncontinuous walk/stand 2 hrs at a

time" because of the pain in her right knee and the "calcific irregularities."  Pl.'s MSJ at 25.

Plaintiff argues that this omission was crucial because it allowed the ALJ to "exclude the

limitation from her RFC assessment and find that [plaintiff] could perform a limited range of

'light' work."  *Id.*  This ability to do light work, according to plaintiff, is contradictory to the

definition of light work in the Social Security Regulations, which states:

> Since frequent lifting or carrying requires being on one's feet up to
> two-thirds of a workday, *the full range of light work requires*
> *standing or walking, off and one, for a total of approximately 6 hours*
> *of an 8-hour workday.*  Sitting may occur intermittently during the
> remaining time.

Pl.'s MSJ at 25-26 (quoting SSR 83-10).  Plaintiff contends that by rejecting this physical

limitation, the ALJ simply ignored the aspects of the doctor's opinion with which she disagreed.

*Id.* at 26.

Defendant argues that the ALJ's failure to include the two hour limit for standing or

walking does not constitute reversible error.  Def.'s MSJ at 9.  Defendant contends that

plaintiff's inability to stand or walk for more than two hours at a time can be accommodated with

regular breaks.  *Id.*  Additionally, defendant argues that the ALJ took these limitations into

consideration by asking the VE about sedentary jobs and by basing her final RFC determination

on those sedentary jobs that the VE provided in his answer.  *Id.*  By doing so, defendant argues

that even if the ALJ had put the two hour continuous stand/walk limitation in her physical RFC

assessment, the ultimate decision that plaintiff is not disabled would have remained the same.

*Id.* at 9-10.

> b.    ALJ's Determination on Mental Limitations

When making a disability determination, Social Security Regulations and Ninth Circuit

precedent require an ALJ to review the entire record.  In *Robbins v. SSA*, the Ninth Circuit

explained this, stating:

////

////

18

1
2
3
4
5
6
7
8

In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record, including, inter alia, medical records, lay evidence, and "the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." See SSR 96-8p, 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). Moreover, SSR 96-8p directs that "[c]areful consideration" be given to any evidence about symptoms "because subjective descriptions may indicate more severe limitations or restrictions than can be shown by medical evidence alone." See SSR 96-8p. When giving such consideration, if the record establishes the existence of a medically determinable impairment that could reasonably give rise to the reported symptoms, an ALJ must make a finding as to the credibility of the claimant's statements about the symptoms and their functional effect. See Soc. Sec. Ruling 96-7p (July 2, 1996) ("SSR 96-7p"), 20 C.F.R. §§ 404.1529, 416.929; *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996).

9  466 F.3d 880, 883 (9th Cir. 2006).  The ALJ can, however, decide what weight to give to what

10  evidence as long as the ALJ's reasoning is free of legal error and is based on substantial

11  evidence.  *See Reddick*, 157 F.3d 715.  An ALJ is required to "consider and evaluate any

12  assessment of an individual's RFC by a state agency medical or psychological consultant,"

13  because those consultants are "experts in the Social Security disability Programs."  SSR 96-6p.

14  Opinions expressed by those consultants may constitute substantial evidence if they are

15  supported by other evidence in the record.  *See Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir.

16  2002) ("[t]he opinions of non-treating or nonexamining physicians may also serve as substantial

17  evidence when the opinions are consistent with independent clinical findings or other evidence

18  in the record").

19  In the present case, the ALJ arrived at her RFC conclusion after reviewing both the RFC

20  assessment conducted by Dr. Nguyen, which was agreed upon by Dr. Gross, and a complete

21  psychiatric evaluation conducted by Dr. Richwerger.  AR 21-22.  In her decision, the ALJ gave

22  great weight to the final RFC assessment by Dr. Nguyen noting that "the residual functional

23  capacity is the measure of what the claimant remains able to do despite her limitations."  AR 22.

24  The ALJ therefore assigned greater weight to Dr. Nguyen's assessment of plaintiff's abilities

25  than to her limitations.  *Id.*  Specifically, the ALJ noted that plaintiff "experiences moderate

26  deficiencies of concentration, persistence or pace . . .[and] the claimant would have *many*

1  moderate limitations, but that she would remain able to do simple, repetitive, tasks with limited

2  public contact." *Id.* (emphasis added).

3       By recognizing the moderate limitations, it appears that the ALJ recognized the

4  limitations expressed by Dr. Richwerger, and which form the basis of plaintiff's argument to this

5  court.  In deciding to accord these limitations less weight, the ALJ appears to have relied on her

6  belief that RFC is based not on limitations, but on remaining abilities, as well as the belief that

7  the conclusions reached by Dr. Richwerger were based on plaintiff's subjective reports.  AR 22.

8  As discussed below, the ALJ in the present case determined plaintiff to be not credible based on

9  inconsistent statements in her testimony and medical records.  For example, plaintiff had told the

10  Administration that she is disabled by knee pain, but she also had told psychologists that her

11  hobbies included bike riding.  AR 21, 142, 215, 237.

12       Opinions given by medical consultants, like Dr. Richwerger, may constitute substantial

13  evidence if they are supported by other evidence in the record.  *Thomas*, 278 F.3d at 957.  Here,

14  Dr. Richwerger's opinion does not appear to have been based solely on plaintiff's subjective

15  reports.  First, Dr. Richwerger's report discusses his evaluation of plaintiff's medical records.

16  AR 235.  Additionally, Dr. Richwerger performed a mental status exam on plaintiff herself.  *Id.*

17  at 238.  This exam included assessing plaintiff's general appearance and mannerisms, as well as

18  conducting tests that assessed her orientation and intellect, psychomotor problems, affect and

19  emotional expression, memory, concentration and attention, abstractions, judgment, calculations,

20  fund of knowledge, proverbs, and reality contact.  *Id.* at 238-39.  It was the result of these tests,

21  along with plaintiff's subjective reports and a review of her past medical records, that led to Dr.

22  Richwerger's assessment and finding of moderate limitations in the areas discussed above.  *Id.* at

23  239-40.

24       Further, Dr. Richwerger's report is supported by other evidence in the record.  First, Dr.

25  Richwerger's GAF assessment matches up with GAF assessments given previously by plaintiff's

26  treating mental healthcare providers.  *Id.* at 162, 205.  Also, his finding that plaintiff would have

moderate limitations in her ability to interact with the public and coworkers is supported in notes
by her treating physicians that she is someone who "is mistrusting of everyone. . . but who is
wanting to trust . . . . She is slightly paranoid about being harmed by others and may tend to
make her kids more afraid than they need to be." *Id.* at 139.  These notes also indicate she
experienced periods when she did not want to go out in public, and times when it was difficult
being around people. *Id.* at 142.  Finally, Dr. Richwerger's findings that plaintiff would have
moderate limitations in her ability to complete a normal workday or workweek without
interruption from psychological symptoms, and moderate limitations in her ability to perform
work activities on a consistent basis, are also supported by evidence from her treating mental
health professionals.  Specifically, her treating mental healthcare provider noted on one occasion
"[Plaintiff] is better but continues to deal with depression and having to force herself into
activities.  She feels overwhelmed and sometimes unable to make decisions. She continues to be
mistrustful of others." *Id.* at 204.  The same counselor went on to note that plaintiff is capable of
work, but remains "paralyzed by her depression" and that she is "mistrustful of others and
therefore the help she receives from others is judged through the lens of someone who feels hurt
by the world and expects to be continually hurt by the world." *Id.* at  206.

Therefore, although the ALJ found plaintiff not to be credible, this was not the only
factor that should have been taken into consideration when assessing the weight to be given to
Dr. Richwerger's report.  Because Dr. Richwerger's opinions regarding plaintiff's mental
limitations are supported by other evidence in the record, those opinions and the bases for them
are evidence that should have been considered and addressed when assessing plaintiff's RFC.
As discussed below, the ALJ's failure to give proper consideration to those opinions, and her
failure to incorporate the mental limitations expressed therein, warrant remand of this case.

////

////

////

1      c.  ALJ's Determination on Physical Limitations

2    The ALJ's final RFC assessment took into account plaintiff's physical limitations by

3 considering the DDS consulting physician's findings.  Specifically, the ALJ stated:

4
> The Disability Determination Service ("DDS") consulting
> physician concluded that the claimant could lift 20 pounds
> occasionally and 10 pounds frequently.  She can stand and/or
> walk for about six hours in an eight-hour workday and
> can sit with normal breaks for about six hours in an eight-hour
> workday.  She can occasionally climb but can never crawl or
> kneel.  The doctor imposed no other limitations.  The undersigned
> Gives great weight to this assessment, as it is consistent with
> substantial evidence of the record.  The undersigned adds,
> however, that the claimant's later diagnosed carpal tunnel
> syndrome would case some additional, although mild, limitations.

10 *Id.* at 21.  Additionally, although the final RFC assessment used the term "light work," which

11 plaintiff argues she cannot do, the hypothetical posed to the VE regarding whether any jobs were

12 available to plaintiff in the current job market reflected plaintiff's concerns by asking whether

13 there were any "sedentary" jobs that plaintiff could perform.  AR 69.  The VE's response to this

14 question included jobs such as surveillance system monitor and order clerk.  *Id.*  It was these

15 sedentary jobs that the ALJ listed in her final RFC assessment as jobs that plaintiff remained

16 *physically* able to do.  *Id.* at 23.  The ALJ's final RFC assessment regarding plaintiff's physical

17 abilities, therefore, appears to properly reflect consideration of all the evidence.  Because the

18 ALJ relied on sedentary jobs available in the market when finding that plaintiff does not qualify

19 as disabled, and not just those involving "light work," the fact that the final RFC assessment

20 states that plaintiff remains able to do light work did not amount to reversible error.

21      2.  Consideration of Plaintiff's Obesity

22    Next, plaintiff contends that the ALJ erred in failing to evaluate plaintiff's obesity under

23 SSR 2-01p.  Plaintiff argues that the medical record clearly indicated that plaintiff was in the

24 obese range of the Body-Mass Index (BMI) chart for long enough to meet the twelve month

25 duration requirement.  Pl.'s MSJ at 26.  Plaintiff states between the years of 2004 and 2008 she

26 had a BMI of between 34 and 38.8 which places her in the obese range.  *Id.*  Plaintiff uses a

report from Dr. Edkin, wherein he states that she is morbidly obese, to support this. *Id.* at 27.

Defendant counters that the ALJ not only found no evidence in the record to support plaintiff's argument for the requisite twelve month period, but that plaintiff failed to raise the issue of her obesity at the hearing. Def.'s MSJ at 10. First, defendant points to the fact that the ALJ recognized that no physician offered an opinion regarding how her obesity influenced or restricted her physical abilities. AR 21. Next, defendant argues that because plaintiff was represented at the hearing, her failure to raise the issue excused the ALJ from developing the issue. Def's MSJ at 10 (comparing *Burch v. Barnhart*, 400 F.3d 679, 682 (9th Cir. 2005) (in finding that the ALJ did not breach the duty to develop the record regarding claimant's obesity, the court stated, "More significantly, Burch was represented by counsel") with *Celaya v. Halter*, 332 F.3d 1177, 1182-1183 (9th Cir. 1995) (ALJ had the duty to consider claimant's obesity when claimant was illiterate and unrepresented at the hearing)).

Social Security Ruling 02-01p qualifies obesity as a severe impairment when "alone, or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities." An impairment will not be considered severe "only if it is a slight abnormality . . . that has no more than a minimal effect on the individual's ability to do basic work activities." SSR 02-01p. When specifically assessing an RFC, the ruling states that, "[obesity] can cause limitation of function. The functions likely to be limited depend on many factors, including where the excess weight is carried." *Id.*

In the present case, there has been no evidence presented to indicate that plaintiff's weight impaired or limited her abilities. The medical report from Dr. Edkin, which plaintiff relies on to make her argument, does classify plaintiff as morbidly obese. AR 285. Plaintiff failed, however, to include the remainder of that sentence which states "[Plaintiff] is a morbidly obese 27 year old female *in no apparent distress*." AR 285 (emphasis added). Dr. Edkin went on to explain that her "right knee has no obvious swelling or effusion with full extension to 130

degrees . . . ." *Id.*  Additionally, Dr. Richwerger's psychiatric evaluation states that her posture and gait were normal and that plaintiff stated her "outside activities [include] hiking and riding a bike." *Id.* at 237-38.  It, therefore, does not appear that plaintiff's obesity is causing her any additional impairment or limitation, such that under SSR 02-01p.  Accordingly, the ALJ did not commit reversible error by failing to develop this issue.

Additionally, plaintiff failed to raise the issue of obesity at the hearing, despite the fact that she was represented by counsel.  In *Burch*, the Ninth Circuit faced a similar situation.  400 F.3d 679.  In *Burch*, the record did not support a claim of obesity and plaintiff failed to raise the issue in the hearing.  As discussed above, the court stated:

> the record does not indicate that Burch's obesity exacerbated her other impairments . . . More significantly, Burch was represented by counsel.  While this court mentioned in *Celaya* that even where a claimant is represented by counsel the ALJ has some burden to develop the record, this court did not specify the parameters of that burden.

400 F.3d at 682.  The court then conducted a similar analysis to determine whether the claimant's obesity was a severe impairment.  *Id.* Specifically, an individualized assessment was made of the obesity's effect on the claimant's ability to function.  *Id.*  Therefore, as in *Burch* where the court found the failure to present the issue at the administrative hearing (despite being represented by counsel), was important, the dispositive fact is that there appears to be no evidence that plaintiff's weight has had any inhibitory effect on her functioning.

### 3.   Failure to Credit Plaintiff's and Third Party's Testimony

Plaintiff further contends that the ALJ erred by discrediting her testimony and the testimony of her ex-husband, Jacob Tremayne.  Pl.'s MSJ at 30-31.  In determining plaintiff's RFC, the ALJ stated the following with regard to plaintiff's credibility:

> At a complete psychiatric evaluation, the claimant told the doctor that she hears voices.  She added, however, that she has been hearing them for many years and that they are less now than they were before.  Notably, she was able to work during the period in which her hearing voices was reportedly greatest.  She told the

24

1
2
3
4
5
6

> psychologist that she had difficulty dealing with the public at her job at Starbucks. Also of note, although the claimant tells the Administration that she is disabled by her right knee pain, she told the psychologist that her hobbies include hiking and riding her bicycle. Although she did state that she has some problems sleeping, her activities of daily living appeared to be normal. Her interpersonal behaviors were "somewhat inconsistent" with her statements: The claimant told the doctor the she has "suicidal ideations all the time - everyday," but she was joking and laughing during the examination.

7   AR 21-22. The psychiatric report that the ALJ was referring to was Dr. Richwerger's. While

8   the ALJ gave great weight to the doctor's observations, she concluded that his opinion that

9   plaintiff would have moderate limitations in a number of areas, "appears to be based on the

10  claimant's subjective reports, which the undersigned finds to be not credible, and are thus

11  accorded less weight." *Id*. at 22.

12      Plaintiff argues that the ALJ erred in concluding that her "medically determinable

13  impairments could reasonably be expected to produce the alleged symptoms," but, despite this,

14  discredited her testimony because, "[her] statements concerning the intensity, persistence, and

15  limiting effects of [those] symptoms [were] not credible to the extent that they are inconsistent

16  with the residual functional capacity assessment." Pl.'s MSJ at 29. Plaintiff contends that the

17  ALJ arrived at this conclusion based on four reasons: 1) Plaintiff complained of knee pain but

18  reported to psychologists that her hobbies included hiking and bike riding; 2) she did not report

19  that she had worked as a caregiver during her time of alleged disability; 3) Plaintiff's counselor

20  noted at one point that she hd quit "another" good job, which the ALJ believed to be for another

21  employer that plaintiff had not reported to the Administration; and 4) her ex-husband had

22  reported that she "is able to do what appears to [the ALJ] to be normal activities of daily living

23  for a stay-at-home mom, although she does reportedly have difficulty getting along with other

24  and was having some problems with her knee and with her memory." *Id.* at 29; AR 20.

25      First, plaintiff argues that the ALJ improperly relied on Dr. Richwerger's report stating

26  that she enjoys hiking and bike riding. Specifically, plaintiff argues that this was "clearly a

misstatement." Pl.'s MSJ at 30.  Plaintiff argues that there is no other mention of hiking or biking in the entire record.  *Id.*  She also points to the fact that her weight makes her obese, therefore, making it unlikely that she would participate in such activities.  *Id.*  Second, plaintiff argues that she did inform the Administration of her caretaking job at the hearing in front of the ALJ, and therefore, was not trying to hide this fact.  *Id.*  Next, plaintiff clarifies that the "other job" referred to in the therapy note was her job as a Starbucks attendant, and that she clarified to the ALJ at the hearing that there was no additional job on top of that.  *Id.*  Finally, plaintiff argues that the ALJ gave "great weight" to certain aspects of her ex-husband's testimony, but failed to recognize other statements from him such as that it took longer for her to bathe and dress due to pain in her knee, that he needed to remind her to take her medications, that she could perform household chores but it took her a long time to complete them and she would often need encouragement to do so, and that she had a hard time dealing with the public and the only public place she went on a regular basis was to visit her counselor.  *Id.* at 30-31.

Defendant counters by asserting that the ALJ properly assessed plaintiff's credibility. Defendant cites to the fact that "credibility determinations are the province of the ALJ."  *Fair v. Brown*, 885 F.2d 597, 604 (9th Cir. 1989).  Once a claimant establishes a medical impairment, according to the defendant, "an ALJ must give specific, clear and convincing reasons in order to reject allegation of such symptoms."  Def.'s MSJ at 11 (citing *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991) (en banc)).  Defendant argues that the ALJ gave such reasons in the present case.  Specifically, defendant contends that the ALJ "discredited Plaintiff because she gave inconsistent testimony; she engaged in daily activities that undermined her claim of total incapacitation, her mental symptoms improved with therapy and medication; she did not receive treatment for an allegedly disabling condition; and she maintained regular employment for some years despite worse symptoms than during her claimed period of disability."  Def.'s MSJ at 11; AR 20-21.

////

1    Defendant contends that the ALJ justifiably considered plaintiff's daily activities,

2  provided to the court by her ex-husband.  Defendant argues that daily activities are informative

3  of a credibility analysis.  Def.'s MSJ at 13 (citing *Burch*, 400 F.3d at 680 ("claimant's daily

4  activities suggest that she is quite functional.  She is able to take care of her own personal needs,

5  cook, clean and shop . . . ") and *Curry v. Sullivan*, 925 F.2d 1127, 1130 (9th Cir. 1991)

6  (claimant's ability to "take care of her personal needs, do light housework, and shop for some

7  groceries" was "inconsistent with the presence of a condition which would preclude all work

8  activity")).  Next, defendant argues that the fact that plaintiff's mental health problems appeared

9  to lessen with treatment is indicative of a lack of credibility.  Def.'s MSJ at 13 (citing *Ware v.*

10  *Comm'r of Soc. Sec.*, 439 F.3d 1001, 1006 (9th Cir. 2006) (impairment that can be controlled is

11  not disabling)).  Finally, defendant argues that plaintiff worked between the years 2002 and

12  2005, years during which she claimed her mental state was worse than it was during the time of

13  her alleged disability, which also points to a lack of credibility.  Def.'s MSJ at 13; AR 236.

14    The ALJ determines whether a disability applicant is credible, and the court defers to the

15  ALJ's discretion if the ALJ used the proper process and provided proper reasons.  *Saelee v.*

16  *Chater*, 94 F.3d 520, 522 (9th Cir. 1995).  If credibility is critical, the ALJ must make an explicit

17  credibility finding.  *Albalos v. Sullivan*, 907 F.2d 871, 873-74 (9th Cir. 1990); *Rashad v.*

18  *Sullivan*, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be

19  supported by "a specific, cogent reason for the disbelief").

20    The Ninth Circuit recently reiterated the two-step analysis that an ALJ must engage in

21  when determining whether a claimant's testimony regarding subjective pain or symptoms is

22  credible:

23    First, the ALJ must determine whether the claimant has presented
   objective medical evidence of an underlying impairment "which

24    could reasonably be expected to produce the pain or other
   symptoms alleged." *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th

25    Cir.1991) (en banc) (internal quotation marks omitted).  The
   claimant, however, "need not show that her impairment could

26    reasonably be expected to cause the severity of the symptom she

27

1    has alleged; she need only show that it could reasonably have
     caused some degree of the symptom." *Smolen v. Chater*, 80 F.3d
2    1273, 1282 (9th Cir.1996).  "Thus, the ALJ may not reject
     subjective symptom testimony ... simply because there is no
3    showing that the impairment can reasonably produce the degree of
     symptom alleged."  *Id.*; *see also Reddick*, 157 F.3d at 722 ("[T]he
4    Commissioner may not discredit the claimant's testimony as to the
     severity of symptoms merely because they are unsupported by
5    objective medical evidence.").

6    Second, if the claimant meets this first test, and there is no
     evidence of malingering, "the ALJ can reject the claimant's
7    testimony about the severity of her symptoms only by offering
     specific, clear and convincing reasons for doing so." *Smolen*, 80
8    F.3d at 1281; *see also Robbins*, 466 F.3d at 883 ("[U]nless an ALJ
     makes a finding of malingering based on affirmative evidence
9    thereof, he or she may only find an applicant not credible by
     making specific findings as to credibility and stating clear and
10   convincing reasons for each.").

11   *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007).  To support a lack of credibility

12   finding, the ALJ must "point to specific facts in the record which demonstrate that [the claimant

13   is in less pain or the claimant's symptoms are less severe] than she claims."  *Vasquez v. Astrue*,

14   547 F.3d 1101, 1105 (9th Cir. 2008).

15          Here, in discrediting plaintiff's testimony, the ALJ noted that the extent of plaintiff's

16   symptoms conflicted with the testimony regarding plaintiff's activities and the medical evidence

17   in the record.  Specifically, the ALJ noted that plaintiff presented conflicting testimony regarding

18   the severity of her knee pain.  Although plaintiff stated that her knee causes her debilitating pain,

19   plaintiff also told her doctors that she would ride her bike or hike when she was feeling

20   depressed.  AR 21.  Plaintiff's argument that Dr. Richwerger improperly recorded this

21   information is unsubstantiated because similar reports to treating mental health providers appear

22   two other times in the record as well.  *Id.* at 142, 215, 237.

23          Additionally, testimony from plaintiff's ex-husband and medical providers conflicts with

24   plaintiff's subjective testimony as to the extent of limitation on her day to day activities.  As

25   discussed above, the "ALJ is responsible for determining credibility, resolving conflicts in

26   medical testimony, and resolving ambiguities."  *Edlund*, 253 F.3d at 1156.  Because the court

1   defers to the ALJ's decision on these matters, as long as the ALJ gave proper reasons for doing

2   so, the court is inclined to do so in the present case as well.

3          Although it is true that "disability claimants should not be penalized for attempting to

4   lead normal lives in the face of their limitations," if the level of activity is inconsistent with a

5   claimant's claimed limitations, the activities would have a bearing on the claimant's credibility.

6   *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (citing *Cohen v. Sec'y of Dep't of Health &*

7   *Human Servs.*, 964 F.2d 524, 530-531 (6th Cir. 1992)). Here, the ALJ specifically stated that the

8   extent of plaintiff's physical activities conflicted with her claimed physical limitations, and that

9   therefore the alleged extent of those limitations was not credible. That statement was supported

10  by the medical opinions that the ALJ cited. Therefore, the court finds that the ALJ adequately

11  provided specific findings as to plaintiff's credibility and stated clear and convincing reasons for

12  each, and properly considered the daily activity report submitted by plaintiff's ex-husband.

13          B.      Failure to Pose Legally Adequate Hypothetical

14          Lastly, plaintiff argues that the ALJ erred by failing to pose a hypothetical to the VE that

15  set out all of her limitations and restrictions, and failed to recognize the answer given by the VE

16  to a hypothetical posed by plaintiff's attorney that did set out such limitations. Pl.'s MSJ at 32.

17  Plaintiff contends that the hypothetical that the ALJ credited was based on her flawed RFC

18  assessment. Specifically, plaintiff contends, the hypothetical failed to encompass the moderate

19  mental limitations recognized by Dr. Nguyen in his RFC assessment, and Dr. Richwerger in his

20  psychiatric evaluation. *Id.* at 33. Finally, plaintiff argues that when her attorney posed a

21  hypothetical question to the VE that encompassed all of her moderate mental limitations, the VE

22  acknowledged that there would be no jobs available to her in the current job market, but the ALJ

23  improperly failed to credit this testimony. *Id.* at 33-34.

24          Defendant counters that the ALJ properly assessed plaintiff's functional limitations and

25  properly questioned the VE thereupon. Def.'s MSJ at 14. Defendant specifically disagrees with

26  the way that plaintiff defines RFC. *Id.* Defendant argues the ALJ's hypothetical questions were

proper because they focused on what plaintiff remained capable of doing despite her limitations, not what those limitations were as plaintiff suggests is required.  *Id.*

The ALJ posed the following hypothetical to the VE when determining if plaintiff could continue work at any of her previous jobs:

> First assume a person the same age, education, and work experience as the claimant and if we assume as was set forth in Exhibit 5F that they could do light work but with only occasional climbing, balancing, never kneeling, and never crawling and could perform only simple repetitive tasks with limited public contact. Would such a person be able to perform the claimant's past relevant work?

AR 67.  This hypothetical was based on the ALJ's ultimate interpretation of the evidence.  The use of the term, "simple repetitive tasks with limited public contact," reflects the ultimate RFC conclusion by Dr. Nguyen in his RFC assessment.  *Id.* at 244.

Plaintiff's counsel then asked the VE whether the moderate mental limitations that were recognized by Doctors Nguyen and Richwerger but that were not included in the ALJ's hypothetical would preclude plaintiff from performing entry level types of jobs.  *Id.* at 68-69.  In response to this hypothetical, the VE stated that "[given] the totality and number of moderate [limitations], I would say yes, they would preclude the entry level types of employment."  *Id.* at 69.

In determining whether there were any other jobs available to plaintiff in the current job market, the ALJ posed this hypothetical:

> If we were to assume a person the same age, education, and work experience as the claimant and if we were to now assume they were limited to sedentary as opposed to light work, obviously the couldn't do their past work, would there be other jobs existing in the national or regional economy such a person could perform?

*Id.* at 69.  In response to this question, the VE concluded that there would be several thousand sedentary jobs in the economy at the unskilled level.  *Id.*  This hypothetical incorporated the idea of sedentary work, which reflect's the ALJ's recognition of plaintiff's inability to stand/walk for more than two hours at a time.  Recognizing the lack of mental limitations again, however,

1   plaintiff's counsel posed the following question to the VE:  "Now I'm assuming from your

2   previous answer that, that the mental impairments in totality that I previously read to you would

3   preclude, preclude the performance of those jobs, correct?"  *Id.* at 70.  The VE responded: "I

4   would say that would be true." *Id.*

5        The ALJ appears to have discredited this response because of the belief that the moderate

6   mental limitations recognized by Dr. Richwerger were based on the subjective reports of

7   plaintiff, whom the ALJ found not to be credible.  AR 22.  The ALJ noted her belief that plaintiff

8   has "moderate difficulties in social functioning and concentration, persistence and pace," but did

9   not believe that they were of the degree that they "would stop her from performing simple,

10  repetitive tasks with limited public contact."  *Id.*

11       As discussed above, however, Dr. Richwerger's opinions regarding plaintiff's moderate

12  mental limitations, which are reflected in Dr. Nguyen's report as well, were not based solely on

13  plaintiff's subjective reports, but were based on Dr. Richwerger's own research and tests.

14  Additionally, his opinions were supported by other evidence in the record, which together are

15  highly probative evidence warranting appropriate consideration.  The ALJ's belief, and

16  defendant's argument, that an individual's RFC is to be based on what an individual is able to do

17  despite limitations, and not based on the limitations themselves, simply underscore the point that

18  the moderate mental limitations should have been included in the hypothetical posed to the VE.

19  Indeed, when those limitations were included in a hypothetical by plaintiff's counsel, the VE

20  concluded that there were no jobs remaining that plaintiff would be able to do.

21       For the foregoing reasons, this matter will be remanded, pursuant to sentence four of 42

22  U.S.C. § 405(g), for further findings relating to the effect plaintiff's moderate mental limitations

23  have on her RFC.  Having concluded that the ALJ properly assessed plaintiff's credibility and

24  physical RFC, and having found that plaintiff's weight does not appear to affect her level of

25  functioning, these issues do not need to be reviewed on remand.

26  ////

VII.  <u>CONCLUSION</u>

In conclusion, the court finds that the ALJ's RFC assessment should have afforded greater weight to plaintiff's moderate mental limitations, and the hypothetical questions posed to the VE should have encompassed these moderate mental limitations.  Therefore, IT IS ORDERED that:

1.  Plaintiff's motion for summary judgment or remand is granted;

2.  The Commissioner's cross-motion for summary judgment is denied;

3. This matter is remanded, pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings consistent with this order; and,

4.  The Clerk is directed to enter judgment for plaintiff.

DATED:  March 29, 2010.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE